**IN THE COURT OF APPEALS OF IOWA**

No. 15-0408
Filed October 14, 2015

**THOMAS HOVEY JR.,**
    Petitioner-Appellee,

**vs.**

**AMANDA G. DAVIS,**
    Respondent-Appellant.
_____

    Appeal from the Iowa District Court for South Lee County, John G. Linn,

Judge.


    Mother appeals from order regarding custody, physical care, visitation,

and support. **AFFIRMED.**


    Robert J. Engler of Robberts, Kirkman & Engler, L.L.L.P., Burlington, for

appellant.

    Robert N. Johnson III, Fort Madison, for appellee.


    Considered by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**MCDONALD, Judge.**

Thomas Hovey and Amanda Davis first met online and then met in-person in Hawaii. He was stationed there while completing his service in the United States Army. She was visiting her brother, who was also stationed there. During her one-week visit, Thomas and Amanda spent time together, and she then returned home to Iowa. C.M.H. was conceived during this visit and was born in 2009. When Amanda notified Thomas she was pregnant, Thomas denied paternity, falsely claiming he was sterile. Two years after her birth, DNA testing established Thomas was C.M.H.'s biological father. Thomas was on active duty at the time paternity was established, and he had no leave time to visit C.M.H. After he discharged from his service obligation in 2012, Thomas returned to his home in Michigan and commenced visitation with C.M.H. After becoming concerned for C.M.H.'s welfare and safety due to several troubling incidents, Thomas filed his application seeking physical care of the child and support. After contested trial, the district court granted the parties joint legal custody of the child, granted Thomas physical care of the child, granted Amanda liberal visitation with the child, and ordered Amanda to pay child support. Amanda timely filed this appeal. On appeal, she contends she should have been granted physical care of the child.

Our review is de novo. *See* Iowa R. App P. 6.907; *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). We review the entire record and decide anew the factual and legal issues presented. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). Prior cases have little precedential value; the

court must make its determination based on the unique facts and circumstances of each case. *In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995); *In re Marriage of Snowden*, No. 14–1920, 2015 WL 4233449, at *1 (Iowa Ct. App. Jul. 9, 2015) ("All happy families are alike; each unhappy family is unhappy in its own way." (quoting Leo Tolstoy, *Anna Karenina* 1 (1873))). "[W]e give considerable weight to the sound judgment of the trial court who has had the benefit of hearing and observing the parties firsthand." *Kleist*, 538 N.W.2d at 278.

The criteria used in making the physical care determination are the same for married and unmarried parents. *See Lambert*, 418 N.W.2d at 42. Physical care is defined as "the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." Iowa Code § 598.1(7) (2013). In making the physical care determination, we look to the factors set forth in Iowa Code section 598.41(3) and our case law. *See* Iowa Code § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974). "Each factor, however, does not necessarily impact the decision with equal force." *In re Marriage of Daniels*, 568 N.W.2d 51, 54 (Iowa Ct. App. 1997). In considering the factors, our ultimate objective "is to place the child in the environment most likely to bring [her] to healthy mental, physical, and social maturity." *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). The controlling consideration is the best interests of the child. *See id.* at 736. Our court will "ultimately decide[ ] by determining under the whole record which parent can minister more effectively to the long-range best interests of the children." *Winter*, 223 N.W.2d at 166.

By way of background, Thomas was born in 1989. He joined the service in January 2008 and was honorably discharged in July 2012. He received commendation while in the service. Thomas currently lives in East Lansing, Michigan, with his wife and her three-year-old son. Thomas has visitation with his five-year-old son from his first marriage. Thomas has secure and stable employment, working as a mechanic. His wife is a patient care technician at a hospital and works part-time in child care. Thomas has exercised regular visitation with C.M.H. since his return to Michigan, driving eight hours between East Lansing and Keokuk. Thomas has paid the costs of visitation without any assistance from Amanda. He was current on his child support obligations.

Amanda was born in 1990. Amanda resides in Keokuk. She is unmarried, but she dates. Amanda does have another child, C.M.H.'s half-sibling, from another relationship, and Amanda has physical care of that child. At the time of trial, Amanda held two jobs, working approximately fifty hours per week. Amanda receives government assistance and support from her mother, who often babysits the two children. The people that live with Amanda's mother and have regular contact with C.M.H. include Amanda's mother's husband, Amanda's twenty-two year old brother, Miles, and Kyle Hall. Kyle Hall is Amanda's former boyfriend.

There are competing considerations presented to the court. On the one hand, the continuity of caretaking responsibility militates in favor of awarding physical care to Amanda. *See* Iowa Code § 598.41(3)(d) (identifying as a factor past caregiving practices); *see also In re Marriage of Hansen*, 733 N.W.2d 683,

697 (Iowa 2007) (discussing what is known as the "approximation rule"). Amanda has served as the child's caretaker since the child's birth. It was only several years after C.M.H.'s birth that Thomas became involved in the child's life. On the other hand, the evidence showed the child's long-term interest militates in favor of awarding physical care to Thomas. The district court directly addressed the issue:

> The dilemma presented to the Court in this case is created by the fact that C.M.H. is closely bonded to Amanda. Amanda is the only parent this child has had, until just recently. Moving to Thomas's home will be traumatic and difficult for the child. The Court must try to balance the child's short-term emotional comfort with what is in the child's long-term best interest. It is tempting to allow the status quo to continue—that would be the easy decision to make. On the other hand, looking to the long-term best interest of this child, the Court concludes granting Thomas physical care of C.M.H. is in her best interests because Thomas can minister more effectively to her present and future needs. The child's placement with Thomas will be temporarily disruptive, but in the long run, such placement is most likely to bring the child to healthy physical, mental, emotional, and social maturity.

On de novo review, we agree with the district court's resolution of the competing considerations. We directly address Amanda's primary argument on appeal and then discuss several of the relevant factors supporting our conclusion.

Amanda's primary argument on appeal is the district court "failed to give adequate weight to the fact the minor child in this matter has resided her entire life with Amanda." We disagree. As set forth above, the district court was acutely aware of the historical caregiving practice and gave it great weight in its decision-making process. She further argues "due to Thomas's voluntary absence from the minor child's life, the issue of quality of care should have been of minimal consequence to the Court." We agree with Amanda that the continuity

of caregiving and the bond between Amanda, Amanda's family, and C.M.H. favor granting physical care to Amanda. Amanda has been the primary caretaker for C.M.H. since her birth. They have a strong bond. C.M.H.'s grandparents have been active in her life. Amanda's father takes the children to church on Sundays. He also takes the children fishing and camping. Nonetheless, we disagree with Amanda's contention that the quality of care should be or is of minimal consequence. Historical caregiving practices do not require continuation of the same practices going forward. *See In re Marriage of Knight*, 507 N.W.2d 728, 730 (Iowa Ct. App. 1993) ("The fact a parent was the primary caretaker prior to the parents' separation does not assure he or she will be awarded custody of the children in a dissolution action."). Instead, the court must do what is in the best interest of the child after considering all relevant factors.

The evidence reflects Thomas is better able to meet C.M.H.'s needs. Thomas's relationship with C.M.H. is not as strong as Amanda's, but he is building a bond with her. "[T]he quality of the parent-child relationship is not always determined by hours spent together or solely upon past experience." *Hansen*, 733 N.W.2d at 697. Thomas and his spouse have stable and appropriate housing. C.M.H. has her own room at Thomas's house. Thomas also has a swing set, playhouse, and picnic table for the children in the yard. In contrast, Amanda's housing situation is not as stable. Thomas and his spouse have steady employment. If granted physical care, Thomas plans to enroll C.M.H. in a preschool run by Michigan State University.

The evidence also reflects Thomas would support C.M.H.'s relationship with Amanda if granted physical care while Amanda would not do so if granted physical care. *See* Iowa Code § 598.41(3)(e) ("Whether each parent can support the other parent's relationship with the child."). Amanda has interfered with Thomas's relationship with C.M.H. She has refused to answer Thomas's telephone calls. She changed her telephone number on multiple occasions to avoid Thomas's parents. She demanded he communicate with C.M.H. only through Facebook, but then she deactivated her account for a period of time. She has interfered with visitation. On one occasion, Amanda told Thomas his parents were allowed to visit C.M.H. but he was not allowed similar visitation. *See Daniels*, 568 N.W.2d at 56 ("A parent's denial of visitation without just cause is a significant factor in determining the proper custody arrangement."). Amanda has diminished Thomas's status as a parent to C.M.H. Thomas testified C.M.H. said to him, "My mom told me to ask you why you weren't you there when I was born," and "My mom says that you're my sperm donor, that's why Daddy Kyle is my real daddy 'cuz he was there when I was born." Amanda has actively interfered in Thomas's efforts to bond with C.M.H., instructing her that she cannot hug Thomas because she is not allowed to love him. Thomas testified C.M.H. will not hug Thomas in Amanda's presence. Thomas's wife testified C.M.H. told her she would like to call Thomas her father but it would make her mom sad. Amanda told C.M.H. she was not supposed to feel comfortable at their house because Thomas and his wife are trying to steal her away from Amanda.

We also conclude Thomas is better positioned to bring C.M.H. to healthy physical, emotional, and social maturity. The evidence reflects concerns for C.M.H.'s welfare while under Amanda's care. A confirmed report of child abuse was made against Amanda. The investigation revealed there were feces in C.M.H.'s bedroom and Amanda locked C.M.H. and her half-brother in the bedroom starting in the early evening until the following morning. The child told the investigator "mommy locks us in the bedroom and we have to stay there" and "she keeps on spanking us." The department confirmed the children were being locked inside their bedroom for extended periods of time and that Z.D., C.M.H.'s half-sibling, defecated and smeared feces in the room. Department of Human Services employee Jennifer Richardson testified that when she viewed Amanda's apartment she saw fecal stains on the carpet and the wall. Further, she testified it appeared some furniture or toys had fecal matter stains. C.M.H. told Richardson her brother went to the bathroom in the bedroom because he was locked in the bedroom and did not have access to the toilet. Relatedly, C.M.H. has medical history consistent with neglect of her hygiene. Her teeth are in poor condition for a child of her age. She has had recurrent urinary tract infections, painful urination, vaginal discharge, frequent irritation of the vulva, and sore throats. She has undergone medical procedures reflecting serious injuries sustained after falling down stairs and after falling out of a grocery cart.

Amanda associates with others who may cause harm to C.M.H. *See In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003) ("[I]f a parent seeks to establish a home with another adult, that adult's background and his or

her relationship with the children becomes a significant factor in a custody dispute.") "There are two reasons for this: (1) because of the place the companion will have in the child or children's lives, and (2) not less significantly, because the type of relationship the parent has sought to establish and the manner he or she has established it is an indication of where that parent's priority for his or her children in his or her life." *Id.* Amanda actively dates without much concern of whether or how her conduct or her choice of paramours will affect C.M.H. She posts on Facebook pictures of herself in lingerie and discusses that she can have sexual encounters with "randoms." Almost all of the men identified during this proceeding that Amanda has dated have criminal records. For example, Kyle Hall, who resided with Amanda and who C.M.H. calls Daddy Kyle, has multiple felony convictions and probation violations. By way of another example, Dustin Leffler, who also resided with Amanda and C.M.H., has numerous convictions, including assault, theft, harassment, criminal mischief, and operating while intoxicated. Amanda has obtained civil protective orders against two of the men she dated. The trial court characterized Amanda's preference as one for "unsavory men." Amanda, by her own admission, likes "bad boys." By way of another example, Amanda told the investigator that a person who was dating her cousin, who was living with Amanda, smacked C.M.H. in the month.

We finally address the relationship between C.M.H. and Z.D., her half-brother. As a general rule, "[s]iblings should not be separated without good and compelling reasons." *Winter*, 223 N.W.2d at 168 (holding it would be "unduly

disruptive to upset the satisfactory relationships which have been established" and that "[d]ivided custody appears to be the least detrimental available alternative."). This rule applies to half-siblings as well. "In order for a court to depart from this general rule, it must appear that separation may better promote the long-range interests of children." *In re Marriage of Orte*, 389 N.W.2d 373, 374-75 (Iowa 1986) (internal quotation marks omitted) (holding the factors surrounding the marriage were not significant enough to separate the half-brothers). Here, the district court's order separates C.M.H. from her half-sibling. As set forth above, there are significant considerations supporting the decision. We also note that while C.M.H. will no longer reside on a day-to-day basis with her half-sibling, she will be able to maintain the relationship through the visitation order. C.M.H. will also be able to develop a relationship with her half-sibling by Thomas and with Thomas's wife's son.

"The critical issue in determining the best interests of the child is which parent will do better in raising the child; gender is irrelevant, and neither parent should have a greater burden than the other in attempting to gain custody . . . .'" *In re Marriage of Ullerich,* 367 N.W.2d 297, 299 (Iowa Ct. App. 1985) (citations omitted). In reaching our decision, we give weight to the district court's findings and conclusions, as the district court was able to personally observe the witnesses and better assess their credibility and demeanor. In light of the foregoing, we agree with the district court that Thomas will do better in raising the child to healthy physical, emotional, and social maturity. We also conclude

Amanda will be able to maintain a significant relationship with the child under the visitation ordered. The judgment of the district court is affirmed.

**AFFIRMED.**